IN RE ESTATE OF ALFRED ANTHONY.
JOSEPH ANTHONY AND ANOTHER v. EVANGELICAL
LUTHERAN CHURCH.

121 N. W. (2d) 772.

May 17, 1963—No. 38,577.

*R. G. Johnson* and *Rosenbloom & Rosenbloom,* for appellants.
*R. M. Saltness* and *Swenson & Nelson,* for respondent.

OTIS, JUSTICE.

The proceedings here for review require a determination of the va-

lidity of four instruments executed by decedent, Alfred Anthony, each purporting to be his last will and testament. Will No. 1 was executed on July 7, 1950, and bequeathed all of decedent's property to his sister, Ida M. Anthony, for life, vesting the remainder in the respondent, Evangelical Lutheran Church. Will No. 2, dated April 21, 1958, purported to revoke all previous wills, and bequeathed testator's entire estate to his three nephews, Carter Anthony, Martin Anthony, and Verle Anthony. Will No. 3, dated March 27, 1959, purported to revoke prior wills and made specific bequests of $100 each to a cousin, a nephew, a niece, and a brother, the residue going to Lutheran Bible Institute. Will No. 4, dated April 8, 1959, purported to revoke prior wills and bequeathed all of testator's estate in equal shares to his brothers, Joseph and Melvin, who are the appellants herein.

Each of the four wills was offered for probate by the interested beneficiaries or representative, and written objection to the allowance of each was in turn filed with the court.

The probate court held that on July 7, 1950, decedent and his sister Ida executed mutual wills making reciprocal provisions for one another pursuant to a binding agreement between them. The court found that respondent church was entitled to specific performance of the contract created by the mutual wills, and held that in so far as the later wills attempted to revoke Alfred's will of July 7, 1950, they were ineffectual. That will was thereupon admitted to probate.

The beneficiaries of will No. 4, Joseph and Melvin Anthony, appealed to the district court. No appeals by the proponents of wills Nos. 2 and 3 were perfected.

By pretrial order, the issues to be determined in the district court were expanded to include, among other things, the question of undue influence with respect to the execution of the will of April 8, 1959. The court, trying the case without a jury, found that there was no agreement between Ida and Alfred not to revoke their mutual wills of July 7, 1950;[1] that Ida died on April 15, 1958, and her will was admitted to probate; that Alfred died on April 15, 1959, at the age of 80; and that the will of April 8, 1959, was induced by undue influence exercised

---

[1]This finding remains unchallenged on appeal to the supreme court.

on Alfred by his brother Joseph and his nephew, Carter Anthony. Accordingly, the court admitted to probate the will of July 7, 1950, and disallowed the three subsequent wills.

In their motion for amended findings or a new trial, appellants expressly raised the question of whether the last three wills revoked the first so as to cause an intestacy. This appeal is from an order denying that motion. There are only two issues for determination: (1) Whether the evidence sustains a finding of undue influence with respect to will No. 4; and, if so, (2) whether the record permits an adjudication that will No. 2 or No. 3 was effective to revoke the will of July 7, 1950.

■ The evidence discloses that Ida and Alfred Anthony were brother and sister, both unmarried, and lived together on the family farm up to the time of Ida's death. Thereafter, Alfred remained on the farm alone, and from time to time, Mona, the wife of his nephew, Carter, took care of his housekeeping needs. The record indicates that Alfred was greatly disturbed by the discovery that his interest in Ida's will was limited and his control of her estate circumscribed. Wills Nos. 2 and 3 were to some extent the product of his displeasure over Ida's testamentary disposition.

At the time of the execution of will No. 4, Alfred was seriously ill in the hospital. His relatives closest in degree were his brothers, Joseph and Melvin, and a sister, Lydia Hanson. Although he had been somewhat estranged from Joseph, there is evidence that during his confinement he was frequently visited by him and by Joseph's son, Carter, and daughter-in-law, Mona. While Alfred was in the hospital immediately prior to his death, according to the testimony of Carter, Alfred requested an interview with an attorney, expressing unequivocally an intention not to leave any of his property to the church. On Saturday, April 4, 1959, Carter and his father, Joseph, consulted Robert Cudd, an attorney practicing in Clara City. Their inquiries were directed in general terms to the probable disposition of Alfred's estate. On the following Monday, Joseph and Carter advised Cudd that Alfred wished to confer with him, and on the same day an interview between them took place at the hospital. Cudd testified that Alfred was emphatic in expressing his intent not to bequeath his property to the church, but at the same time he was undecided as to what disposition should be made of his estate. In

leaving, the attorney stated to Alfred, "Well, you think about it and make a decision on what you want to do." In the course of their conversation Alfred had indicated to Cudd a leaning toward appellants, but discussed other relatives as well. Cudd thereupon advised Joseph and Carter that Alfred had not definitely made up his mind, said he would prepare a will, but added that "it's going to have to be his will and it will have to be taken care of and as required by law." At the suggestion of Joseph and Carter, Cudd then prepared the will of April 8, 1959, and a codicil expressly revoking all bequests to the Lutheran Bible Institute and the Evangelical Lutheran Church. These instruments were delivered to Carter Anthony at the hospital. After their initial discussion Cudd neither saw nor interviewed Alfred Anthony again, nor did he in any manner explain the terms of the will. The witnesses to the actual execution of the will were furnished by Carter and his wife, who drove them to the hospital. No discussion of the contents of the will was had in the presence of the witnesses, although they testified that Alfred expressed his satisfaction with its provisions. He did, however, refuse to sign the codicil which would have expressly revoked previous bequests to the Lutheran Bible Institute and Evangelical Lutheran Church. The will was retained by Carter after its execution and delivered by him to his father's attorney.

In his memorandum the trial court noted that there was no evidence to suggest that the first interview between Carter, Joseph, and Robert Cudd was prompted by Alfred. The court further pointed out that Alfred didn't actually request Cudd to prepare a will and that the will was witnessed by friends of Carter, whose testimony and that of Carter and his wife relating to its execution did not favorably impress him. In addition, it appeared significant to the trial court that Alfred had no opportunity to talk to Cudd about the will after it was drafted for execution, and that Carter submitted it to his father's attorney after it was signed. Further weight was given to the fact the will in question was executed only 12 days after will No. 3, which had provided for bequests wholly at variance with those directed in the later will. Under these circumstances the court concluded that the will was the product of un-

due influence exercised by Carter Anthony and his father, Joseph. We concur in this decision.

In support of their contention that the court's findings are not sustained by the evidence, appellants call attention to the testimony that Alfred was strong-willed and mentally sound at the time he signed the will; that he emphatically expressed an intent to revoke his gifts to the church, and stated his approval of the terms of the will; and that the provisions substantially conformed to the disposition which would be required under the intestacy laws.

The law governing undue influence is so well settled that we need only cite a few cases. Significantly, in recent years we have sustained the trial court's findings in all but two appeals.[2] The decisions are nearly evenly divided between those which found undue influence to exist[3] and those which did not.[4]

Essentially our function is limited to determining whether or not the trial court's conclusions are manifestly and palpably contrary to the evidence, viewed in the light most favorable to respondent. The contestant has the burden of proving by clear and convincing evidence not only that influence was in fact exerted, but improperly so, and that it resulted in expressing the will and intent of someone other than the testator. The influence must be of a degree which, by moral coercion or constraint, overpowers the testator's free agency and substitutes the will of the person exercising it.

Contestant must prove that the improper influence operated at the

---

[2] In re Estate of Mazanec, 204 Minn. 406, 283 N. W. 745; In re Estate of Marsden, 217 Minn. 1, 9, 13 N. W. (2d) 765, 770.

[3] Leuba v. Bailey, 251 Minn. 193, 88 N. W. (2d) 73; In re Estate of Wilson, 223 Minn. 409, 413, 27 N. W. (2d) 429, 432; In re Estate of Stephens, 207 Minn. 597, 293 N. W. 90; In re Estate of Mollan, 181 Minn. 217, 232 N. W. 1.

[4] In re Estate of Holden, 261 Minn. 527, 113 N. W. (2d) 87; In re Estate of Reay, 249 Minn. 123, 126, 81 N. W. (2d) 277, 280; In re Estate of Rasmussen, 244 Minn. 215, 221, 69 N. W. (2d) 630, 635; Borstad v. Ulstad, 232 Minn. 365, 371, 45 N. W. (2d) 828, 832; In re Estate of Meehan, 220 Minn. 1, 18 N. W. (2d) 781.

very time the will was signed and dominated and controlled its execution.

While the existence of undue influence may be shown by circumstantial evidence and usually is, still it is not enough that there be evidence only of inclination, motive, and opportunity, which merely arouses suspicion and conjecture. However, where these factors combine with the active participation of a beneficiary in securing the preparation and execution of a will by one who is aged and infirm, resulting in disparate treatment of next of kin without apparent relationship to previous bonds of affection, the trial court may infer the existence of undue influence from such surrounding circumstances.

We have observed that drastic changes in a will, made by a testator when ill, call for the fullest explanation and justification, and constitute a strong circumstance supporting a charge of undue influence against the beneficiary thereby favored.[5] With these broad principles in mind, we have no difficulty in holding that there was ample evidence to support the trial court's findings. Appellants rely for reversal on In re Estate of Holden, 261 Minn. 527, 113 N. W. (2d) 87. Without attempting to distinguish in detail all of the facts in that case, it is enough to say that it disclosed a close tie of long duration between the testatrix and beneficiary which is wholly absent here.

While there was much testimony in the instant case that testator entertained a fixed purpose not to benefit the Evangelical Lutheran Church, he had bequeathed all of his estate except $400 to the Lutheran Bible Institute only 12 days before signing the will of April 8, 1959, and significantly refused to execute a codicil expressly revoking that bequest. Taking into consideration the previously cool relationship between Alfred and Joseph; the unexplained inclusion of his brother Melvin and exclusion of his sister Lydia; the active and aggressive participation of Carter and Joseph in securing the new will of April 8, 1959; the great indecision concerning beneficiaries expressed by testator to the lawyer who drafted that instrument; and the failure of counsel to confer with decedent at any time subsequent to its preparation, we are of the opin-

---

[5]In re Estate of Olson, 227 Minn. 289, 297, 35 N. W. (2d) 439, 445.

ion that circumstantial evidence of undue influence manifestly supports the trial court's conclusion.

■ In determining whether appellants were entitled to an adjudication with respect to the revocatory effect of wills Nos. 2 and 3, the trial court held that the statements of law and fact on appeal from the probate court did not include this issue. The appellants there stated as one issue:

"As to matters of fact, the Probate Court erred in that:

"1. It found the document executed by deceased on July 7th, 1950, to be his last will, whereas in fact the evidence before the Court showed that three (3) testamentary documents were duly executed by him subsequent to said date."

In its answer to this statement respondent recited, among other things, "that the attempted revocations by the decedent Alfred Anthony as contained in the wills of April 21, 1958, March 27, 1959 and April 8, 1959, also offered for probate herein were wholly ineffectual to revoke said will of July 7, 1950."

While it appears to be undisputed that appellants did not expressly urge the court to find that Alfred died intestate but relied on resisting the claim of undue influence, and objected to the receipt in evidence of wills Nos. 2 and 3, we are of the opinion that the statements referred to on appeal from probate court are sufficiently broad to preserve for consideration the issue of intestacy. Therefore, the only question which remains is whether or not will No. 2 or will No. 3 revokes as a matter of law will No. 1.

Minn. St. 525.19, which governs, provides in part as follows:

"No will in writing shall be revoked or altered otherwise than by some other will in writing; *or by some other writing* of the testator declaring such revocation or alteration, and executed with the same formalities with which the will itself was required by law to be executed; * * *." (Italics supplied.)

Since no appeal has been taken from the probate court's disallowance of wills Nos. 2 and 3, there has been a final adjudication, not now reviewable, that these instruments do not constitute wills as such. The

question remains whether they qualify as "some other writing of the testator." To have revocatory effect there must be proof that the instruments were executed with the formalities required by § 525.18, subd. 1, which provides:

"Every person of sound mind, not a minor, may dispose of his estate, or any part thereof, or any right or interest therein, by his last will in writing, signed by him or by some person in his presence and by his express direction, and attested and subscribed in his presence by two or more competent witnesses."

There was evidence that will No. 3 conformed to the requirements of the statute, but no such proof was offered with respect to will No. 2.

While we have not passed squarely on this question, we dealt with a related problem in In re Cunningham, 38 Minn. 169, 36 N. W. 269. There proof was available to show that a destroyed will contained a provision for revocation of a previous will, but there was no other evidence of how the testator intended to dispose of his estate. We held that the destroyed instrument operated as a revocation notwithstanding it was otherwise ineffective as a will. In a later case we rejected the view that a provision for revocation takes effect immediately upon the signing of a will, suggesting that it is ambulatory until the death of the testator. In re Estate of Tibbetts, 153 Minn. 53, 189 N. W. 401. A number of courts have concluded that an instrument which for some reason fails as a will may nevertheless constitute a revocation if executed with testamentary formality.[6] We adopt the rule announced in these decisions and hold that the wills signed by Alfred Anthony on April 21, 1958, and on March 27, 1959, may be effective to revoke previous wills if otherwise valid and executed in compliance with § 525.19, notwithstanding that as a matter of law they have no other probative value

---

[6]Blackett v. Ziegler, 153 Iowa 344, 353, 133 N. W. 901, 904, 37 L. R. A. (N.S.) 291; Burtt Will, 353 Pa. 217, 227, 44 A. (2d) 670, 675, 162 A. L. R. 1053, 1060; In re Heazle's Estate, 72 Idaho 307, 240 P. (2d) 821; Miller v. Munzer (Mo. App.) 251 S. W. (2d) 966; In re Lubbe's Estate (Fla. App.) 142 So. (2d) 130, 136; In re Neubert's Estate, 59 Wash. (2d) 678, 686, 369 P. (2d) 838, 843.

because they have been disallowed by the court, and the time within which to appeal from that decision has expired.[7]

■ The final issue is whether the doctrine of "dependent relative revocation," which we recognized in In re Estate of Nelson, 183 Minn. 295, 298, 236 N. W. 459, 461, applies. We stated there:

"Where the circumstances connected with the revocation are such as to raise the inference that the testator meant the revocation of the old to depend upon the efficacy of the new disposition intended to be substituted, such will be the legal effect of the transaction; and, if through lack of formality or otherwise the intended new will is inoperative, the revocation fails and the original will remains in force. Revocations ordinarily included within the doctrine of 'dependent relative revocation' are properly either conditional revocations or revocations made under mistake. * * * Of course where the revocation is not absolute but is dependent upon the making by the testator of a new will, the doctrine will protect the old will if the relative act proves futile."

The rule is predicated to some extent on the reluctance of courts to find that intestacy is intended.[8]

While it appears that the doctrine originally applied only to physical destruction or mutilation of a will, it has now been extended to revocations attempted by the execution of a subsequent will.[9]

In remanding the matter for further proceedings, we recognize, and do not condone, the appellants' failure to press the intestacy issue before the district court. We hesitate to permit a piecemeal trial occasioned by the parties' neglecting to litigate vigorously the questions they now

---

[7]See, also, Annotation, 59 A. L. R. (2d) 11, § 14; 3 Page, Wills (Bowe-Parker Revision) § 26.12, note 22.

[8]In re Trusteeship Under Will of Tweedie, 234 Minn. 444, 448, 48 N. W. (2d) 657, 659.

[9]Linkins v. Protestant Episcopal Cathedral Foundation, 87 App. D. C. 351, 353, 187 F. (2d) 357, 359, 28 A. L. R. (2d) 521, 524; In re Smalley, 131 N. J. Eq. 175, 24 A. (2d) 515; see, also, Warren, *Dependent Relative Revocation*, 33 Harv. L. Rev. 337; 24 Minn. L. Rev. 298; 2 Page, Wills (Bowe-Parker Revision) §§ 21.57 to 21.65; 57 Am. Jur., Wills, § 517; 95 C. J. S., Wills, § 267.

raise. However, we are of the opinion that in an exceptional case the ends of justice may make it desirable to amplify the evidence bearing on testator's intention. Accordingly, it will be the trial court's duty first to determine whether either will No. 2 or will No. 3 constitutes a testamentary revocation of will No. 1 within the meaning of the statute as we have here construed it. If so, the question remains whether the testator intended such revocation to become operative if the revocatory document could not otherwise dispose of his estate to prevent intestacy. The matter is accordingly remanded for the trial court to receive whatever extrinsic evidence of the testator's intention may be available, and to enter appropriate findings determining whether or not the will of July 7, 1950, shall be probated.

Remanded.

MR. JUSTICE SHERAN, not having been a member of this court at the time of argument and submission, took no part in the consideration or decision of this case.